IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ANA HENRIQUEZ,                     §
                                   §
              Plaintiff,           §
                                   §
V.                                 §          No. 3:16-cv-868-M-BN
                                   §
CITY OF FARMERS BRANCH, TEXAS      §
and KEN D. JOHNSON,                §
                                   §
              Defendants.          §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

This case, reopened on September 30, 2021, *see* Dkt. Nos. 43, 46, remains referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference from Chief Judge Barbara M. G. Lynn. Through a first amended complaint [Dkt. No. 47] (the FAC), Plaintiff Ana Henriquez asserts civil rights violations and assault and battery against Defendants City of Farmers Branch, Texas and Ken Johnson based on Johnson's shooting to death her minor son.

The City moved to dismiss the claims asserted against it in the FAC. *See* Dkt. No. 52. Henriquez responded. *See* Dkt. No. 56. And the City replied. *See* Dkt. No. 58.

Johnson responded to the FAC by answering it, asserting qualified immunity, *see* Dkt. No. 50, and moving to dismiss it based, in part, on qualified immunity, *see* Dkt. Nos. 48, 49, 50. And the Court converted the portion of Johnson's motion to dismiss based on qualified immunity to a Federal Rule of Civil Procedure 56 motion for summary judgment. *See* Dkt. No. 51.

As further allowed by the Court's conversion order, Henriquez filed a motion for leave to conduct limited discovery in order to respond to the qualified immunity issues raised in the converted summary judgment motion. *See* Dkt. No. 54. After Johnson responded, *see* Dkt. No. 55, the Court granted the motion for leave in part, *see* Dkt. No. 57. As ordered, *see id.*, Henriquez notified the Court that she received the authorized qualified immunity discovery, *see* Dkt. No. 59. She then filed a court-ordered response to Johnson's assertion of qualified immunity. *See* Dkt. Nos. 61-63. And Johnson replied. *See* Dkt. No. 64.

The undersigned now enters these findings of fact, conclusions of law, and recommendation that, for the reasons and to the extent set out below, the Court should grant both motions.

## Discussion

**I.    The Court should grant the City's motion to dismiss and dismiss the claims against it with prejudice unless – through her objections to these findings, conclusions, and recommendations – Henriquez shows that she should be granted leave to allege a plausible claim of municipal liability through a second amended complaint.**

### A.    Legal Standards

In deciding a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). Such a motion is therefore "not meant to resolve disputed facts or test the merits of a lawsuit" and "instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a

plausible case for relief." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020).

Even so, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.[1]

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* And "[a] claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679); *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" (quoting *Iqbal*, 556 U.S. at 678 (quoting, in turn, FED. R. CIV. P. 8(a)(2)))).

---

[1] *Cf. Sewell*, 974 F.3d at 582 ("Although this framework is one-sided, the issue 'is not whether a plaintiff will ultimately prevail but whether he is entitled to offer evidence to support his claims.' The other side will have its say later." (quoting *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *vacated on other grounds*, 113 F.3d 1412 (5th Cir. 1997))).

Federal Rule of Civil Procedure 8(a)(2) does not mandate detailed factual allegations, but it does require that a plaintiff allege more than labels and conclusions. And, while a court must accept a plaintiff's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Consequently, a threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.* Instead, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *see also Inclusive Communities*, 920 F.2d at 899 ("'Determining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679; citation omitted)).

These general pleading standards apply to a claim against a municipality. *See also Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) ("There is no heightened pleading standard for [42 U.S.C.] § 1983 claims against municipalities. To survive a motion to dismiss, the complaint need not contain detailed factual allegations but still must state sufficient facts to establish a plausible claim on its face." (citing *Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 622 (5th Cir. 2018))).

But, because "[a] person may sue a municipality that violates his or her

constitutional rights [only] 'under color of any statute, ordinance, regulation, custom, or usage,'" *id.* (quoting Section 1983; citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)), a plaintiff alleging a *Monell* claim "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation," *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Monell*, 436 U.S. at 694).

So, "[i]n municipal-liability cases," the threshold question "is whether the complained-of 'act may fairly be said to represent official policy.'" *Id.* at 792-93 (cleaned up; quoting *Monell*, 436 U.S. at 694); *see also Hutcheson*, 994 F.3d at 483 (rejecting the argument that a district court errs by dismissing a *Monell* claim without first analyzing the underlying constitutional violation).

> And a plaintiff may proceed on a *Monell* claim only by
>
> identify[ing] "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up). Municipalities are not liable "on the theory of respondeat superior" and are "almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

*Hutcheson*, 994 F.3d at 482; *see also Brown v. Tarrant Cnty., Tex.*, 985 F.3d 489, 497 & n.11 (5th Cir. 2021) (noting that where a plaintiff's claim fails as to one prong, a court "need not consider whether [his] claim also fails the other two *Monell* prongs" (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010))).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form

of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting, in turn, *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc))); *see also Brown*, 985 F.3d at 497 ("An 'official policy' may take two forms – either a 'policy statement formally announced by an official policymaker' or a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" (quoting *Zarnow*, 614 F.3d at 168-69)).

"[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." *Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

So an alleged failure to train (or to supervise) "is a separate theory of municipal liability, but the same standard applies both to a failure to train [or to supervise] claim and to a municipal liability claim." *Pinedo v. City of Dall., Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *9 (N.D. Tex. Aug. 25, 2015) (citations omitted); *see Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (A "failure-to-train theory requires a plaintiff to prove that '1) the [city] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or

supervise constituted deliberate indifference to the plaintiff's constitutional rights.'" (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001))); *Pinedo*, 2015 WL 5021393, at *9 ("To plead a plausible claim, [Plaintiff] must allege facts that enable the court to draw the reasonable inference that '(1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [his] injury.'" (quoting *Carnaby v. City of Hous.*, 636 F.3d 183, 189 (5th Cir. 2011))).

Regardless the theory of municipal liability, "[t]o proceed beyond the pleading stage, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts.'" *Peña*, 879 F.3d at 622 (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); footnote omitted); *see also Pinedo*, 2015 WL 5021393, at *5 (N.D. Tex. Aug. 25, 2015) ("To establish a custom, a plaintiff must demonstrate (and, at the pleading stage, must plausibly plead) 'a pattern of abuses that transcends the error made in a single case.'" (quoting *Piotrowski*, 237 F.3d at 582)).

### B.    Analysis

Henriquez asserts a Section 1983 claim (for the alleged constitutional violation) against the City under three theories of liability (which she sets out as three separate counts) – Unconstitutional Custom, Policy or Practice (Count II); Failure to Train (Count III); and Failure to Supervise and/or Discipline (Count IV). *See* Dkt. No. 47, ¶¶ 94-105.

Starting with Henriquez's custom-policy-or-practice theory, she alleges that

"the written policies on use of force" of the City's police department (the FBPD) "is not the de facto policy of the FBPD. The de facto policy is that which Johnson employed when he rammed his SUV into J.C.'s vehicle, immediately exited his vehicle, and began running to J.C.'s vehicle while firing his weapon at J.C." Dkt. No. 47, ¶ 59. She further alleges that

> Johnson was poorly trained and relied on the defective de facto policy of FBPD, which was to use deadly force even when there exists no immediate threat of harm to officers or to others. This de facto policy has the effect of allowing situations where officers may shoot first and ask questions later.
>
> The FBPD has a pattern, practice, history, and custom of using excessive force against minorities, including approaching them with guns drawn when there is no imminent threat of bodily injury or other justifiable reason to do so.
>
> The FBPD trains its officers to use deadly force even when there exists no immediate threat to officers or to others.
>
> Chief [of Police Sid] Fuller, as the final policymaker for FBPD, along with the Farmers Branch City Council and the City knew or should have known that the training provided to Johnson was inadequate or nonexistent.
>
> Further, the City has vague rules and policies regarding the pursuit of suspects and the use of deadly force. This vagueness allowed Johnson to behave in a manner that [led] to the death of J.C.
>
> Farmers Branch Responsibility and General Conduct B.6.d demonstrates the vagueness of City policy that is tantamount to encourage officers to take various inconsistent and unpredictable courses of action, both on and off duty.

*Id.*, ¶¶ 65-70. In further support, Henriquez alleges that the City has a "culture of hostility towards minorities." *Id.* at 10; *see also id.*, ¶¶ 74-83 (concluding that "[t]his anti-Latino culture within the City was responsible for Johnson's actions when he racially profiled J.C. in the red Dodge Challenger, immediately believed him to be a criminal suspect from past police reports, and initiated an encounter with J.C.").

As these allegations demonstrate, Henriquez's custom-policy-or-practice

theory intertwines with her failure-to-train and failure-to-supervise theories. As to

those theories, she also alleges that

> [t]he FBPD did not provide adequate training to Johnson as it relates to
> the use of deadly force and the use of non-deadly force.
>     The FBPD failed to provide adequate training to Johnson as it
> relates to proper arrest and confrontation tactics when confronting
> suspects or an active crime scene.
>     The FBPD failed to provide adequate training to Johnson as it
> relates to the appropriate methods and techniques to control situations
> like the one encountered by Johnson on March 13, 2016....
>     Johnson should have been appropriately trained to deal with
> unarmed suspects posing no threat of bodily injury or harm to officers
> or to others.
>     Johnson should have been appropriately trained on how to
> approach an active crime scene and the need to either deescalate the
> encounter or to take cover before confronting suspects.
>     Johnson immediately resorted to the use of deadly force against
> J.C. and never attempted to de-escalate the encounter with J.C.
>     After crashing his SUV into J.C.'s vehicle, Johnson immediately
> exited his SUV with his gun drawn and pointed at J.C.'s vehicle as he
> approached and fired 16 rounds into J.C.'s vehicle.
>     Johnson recklessly fired multiple shots at J.C. and into his vehicle
> without appropriately analyzing the situation and the need for force
> when a major car collision had just occurred.

*Id.*, ¶¶ 56-58, 60-64.

In sum, Henriquez appears to allege that the City's official policy as to the use

of force is so vague or so inadequate that its de facto policy (or custom) is to use

excessive – or even deadly – force. She does not therefore "link" the alleged

constitutional violation to "a 'policy statement formally announced by an official

policymaker.'" *Brown*, 985 F.3d at 497 (quoting *Zarnow*, 614 F.3d at 168-69).

And Henriquez has not plausibly alleged a widespread practice that equates to

a custom based on the single incident alleged.

> "If actions of city employees are to be used to prove a custom for which
> the municipality is liable, those actions must have occurred for so long

> or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.

*Webster*, 735 F.2d at 842.

> [And p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question. That is, notice of a pattern of similar violations is required. While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired.

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (footnotes omitted). So Henriquez's allegations as to the City's "culture of hostility towards minorities," specifically Latinos, do not allege "a pattern" of violations similar to the single incident here.

Neither does the single-incident exception apply based on Henriquez's allegations, where there is no factual basis to infer that Johnson was a policymaker for the City. *See Arevalo v. City of Farmers Branch, Tex.*, No. 3:16-cv-1540-D, 2017 WL 5569841, at *4 (N.D. Tex. Nov. 20, 2017) ("A single incident unaccompanied by supporting history will likely be an inadequate basis for inferring such a custom or usage unless the actor or actors involved had been given official policy-making authority." (quoting *Renfro v. City of Kaufman*, 27 F. Supp. 2d 715, 717 (N.D. Tex. 1998) (citing, in turn, *Worsham v. City of Pasadena*, 881 F.2d 1336,1339-40 (5th Cir. 1989)))).

But, even if the Court finds that Henriquez has alleged enough factual content to plausibly show a policy, *cf. Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 559 (5th Cir. 2017) ("[P]leadings are sufficient when they make specific factual allegations that allow a court to reasonably infer that a policy or practice exists and that the alleged

policy or practice was the moving force behind municipal employees' [alleged constitutional violations]." (citing *Colle v. Brazos Cnty.*, 981 F.2d 237, 245 (5th Cir. 1993))), her claim against the City fails at *Monell*'s second prong.

Examining this requirement – a policymaker who can be charged with actual or constructive knowledge of the identified official policy or custom – a complaint need "not specifically identify [the municipality's] policymaker," *Balle*, 952 F.3d at 559, because that identity "is a question of state law," and "courts should not grant motions to dismiss § 1983 cases 'for imperfect statement of the legal theory,'" *Groden v. City of Dall., Tex.*, 826 F.3d 280, 284-85 (5th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988), then quoting *Johnson*, 574 U.S. at 11).

Instead, the well-pleaded facts must "establish that the challenged policy was promulgated or ratified by the city's policymaker." *Id.* at 285; *see also Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) ("Because the 'specific identity of the policymaker is a legal question that need not be pled,' plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the [policymaker] either adopted a policy that caused [their] injury or delegated to a subordinate officer the authority to adopt such a policy. In other words, plaintiffs must plead facts that sufficiently connect the policymaker ... to the allegedly unconstitutional policy." (citing *Groden*, 826 F.3d at 284, 286)).

Henriquez alleges that "Chief Fuller [is] the final policymaker for FBPD" and that he and "the Farmers Branch City Council and the City knew or should have

known that the training provided to Johnson was inadequate or nonexistent." Dkt. No. 47, ¶ 68.[2] But she also alleges "that the City of Farmers Branch and its Policymakers, specifically Mayor Bob Phelps, the Farmers Branch City Council, Chief of Police Sid Fuller, and City Manager Charles Cox, failed to properly train, supervise, screen, discipline, transfer, counsel, or otherwise properly equip and control officers including those who are known, or who should have been known, to engage in the use of excessive force" and that "the City failed to properly implement training and policies governing the appropriate use of lethal force on members of the public." *Id.*, ¶ 3.

Regardless of who is the policymaker under Texas law, Henriquez fails to allege facts (as opposed to mere conclusions) that connect the policymaker to the allegedly unconstitutional policy. *See id.*, ¶¶ 4-6 ("Chief of Police Fuller was directly involved in implementing the policies and priorities of the Farmers Branch City Council, including the training of police officers within the department. Chief Fuller

---

[2] *But see Arevalo*, 2017 WL 5569841, at *6 ("Arevalo has failed to allege any state or local law or evidence of custom that would enable the court to reasonably infer that the Farmers Branch chief of police possesses final policymaking authority. She instead relies solely on the repeated, conclusory assertions that Chief Fuller is a 'final policymaker.' These threadbare recitations of a *Monell* element are insufficient to plausibly plead that Chief Filler is a final policymaker. This is because the policymaking authority of chiefs of police within their own department is not something that can be inferred from their title alone. Courts that have determined that chiefs of police are final policymakers have done so because the particular governmental body has provided the chief of police with policymaking authority. Other government entities, such as the City of Dallas, do not delegate final policymaking authority to their chief of police. Thus without any additional well-pleaded facts regarding a particular police chief's policymaking authority, the court cannot reasonably infer that the chief of police is a de facto final policymaker." (citations omitted)).

had actual knowledge of the lack of adequate training within the department on use of deadly force, racial profiling, de-escalation, and confronting suspects and active crime scenes. The City had a duty, but failed to implement and/or enforce policies, practices and procedures for the [FBPD] that respected J.C.'s constitutional rights, including the right to be free from excessive force. This duty was delegated to the Farmers Branch City Council and Mayor, who hired City Manager Cox to carry out the policies and actions of the City Council and oversee the day-to-day operations of the City. Chief Fuller similarly had a responsibility to oversee the day-to-day operations of the FBPD. The City of Farmers Branch and its Policymakers failed to implement the necessary policies and practices that would have protected J.C.'s constitutional rights. Further, the City implemented unconstitutional policies and practices that caused J.C.'s unwarranted pain, suffering, and death.").[3]

Turning to municipal liability based expressly on a supposed failure to train or failure to supervise, Henriquez must allege (1) that the City "failed to train or supervise" Johnson; (2) that "there is a causal connection between the alleged failure to supervise or train and the alleged violation of [J.C.'s constitutional] rights"; and (3) that "the failure to train or supervise constituted deliberate indifference to the [J.C.'s] constitutional rights." *Thompson*, 245 F.3d at 459; *Peña*, 879 F.3d at 623.

"In resolving the issue of a municipality's liability, the focus must be on

---

[3] *See also Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 246 (5th Cir. 2021) (per curiam) ("There is a fundamental difference between decision makers and policymakers," such that "'[d]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function.'" (quoting *Bolton v. City of Dall.*, 541 F.3d 545, 548-49 (5th Cir. 2008))).

adequacy of the training program in relation to the tasks the particular officers must perform." *Shumpert*, 905 F.3d at 317 (cleaned up; quoting *City of Canton*, 489 U.S. at 390). And "'the connection must be more than a mere 'but for' coupling between cause and effect.' 'The deficiency in training must be the actual cause of the constitutional violation.'" *Id.* (quoting *Valle v. City of Hous.*, 613 F.3d 536, 546 (5th Cir. 2010)).

But, even if these prongs are plausibly alleged, "[d]eliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Valle*, 613 F.3d at 547. As such, "a plaintiff must [allege – and then ultimately – ]show that,

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Wright v. City of Garland, Tex.*, No. 3:10-cv-1852-D, 2014 WL 5878940, at *4-*5 (N.D. Tex. Nov. 13, 2014) (quoting *Valle*, 613 F.3d at 547 (quoting, in turn, *City of Canton*, 489 U.S. at 390)).

> Deliberate indifference may be found in two types of situations: (1) a general failure to provide adequate training in light of the foreseeable serious consequences that could result, and (2) a municipality fails to act in response to the specific need to train a particular officer. *See City of Canton*, 489 U.S. at 390; *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000).

*Hobart v. Estrada*, 582 F. App'x 348, 357 (5th Cir. 2014) (citations modified).

Taking the second method first, Henriquez's allegations do not meet "the narrow 'single incident' exception" articulated in *Bryan County*. She does allege that, prior to being hired by the City, Johnson was "a police officer with the Dallas Area

Rapid Transit," during which employment he "had at least three excessive force complaints lodged against him." Dkt. No. 47, ¶¶ 53, 54. But these allegations fall materially short of the extreme facts underlying *Bryan County*:

> "In the one case in which [the United States Court of Appeals for the Fifth Circuit] found a single incident sufficient to support [governmental] liability, there was an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force." *Valle*, 613 F.3d at 549 (quoting *Bryan Cnty.*, 219 F.3d at 462). The *Bryan County* case involved a wholesale failure to train a particular officer on the constitutional limits of the use of force. *Bryan Cnty.*, 219 F.3d at 458, 462. The court in *Bryan County* "focused on the decision by the sheriff to place his nephew, a completely untrained new deputy, 'on the street to make arrests.'" *Thompson v. Connick*, 578 F.3d 293, 299 (5th Cir. 2009) (quoting *Bryan Cnty.*, 219 F.3d at 458). "Within the two-year period before his hire, [the officer] had been arrested for assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, and nine moving traffic violations." *Bryan Cnty.*, 219 F.3d at 454. Moreover, "at the time he was hired, [the officer] was in violation of the terms of his probation ... [and] he had an outstanding warrant for his arrest." *Id.* at 454-55. The finding of deliberate indifference in *Bryan County* was based upon the officer's extreme "'personal record of recklessness and questionable judgment,' inexperience, exuberance, and involvement in forcible arrest situations." *Valle*, 613 F.3d at 549 (quoting *Bryan Cnty.*, 219 F.3d at 462).

*Roberts v. Cole*, No. 1:08-CV-406, 2010 WL 11549930, at *12 (E.D. Tex. Nov. 30, 2010) (citation modified).

Turning back to the first approach, it "usually" requires allegations to "show a pattern of similar violations." *Hobart*, 582 F. App'x at 357 (citing *Valle*, 613 F.3d at 547); *see also Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) ("This proof-by-pattern method is 'ordinarily necessary.'" (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409, 117 (1997))).

Although Henriquez alleges no pattern of similar violations,

deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an "obvious" or "highly predictable consequence" of the alleged training inadequacy. Such an inference is possible in only very narrow circumstances: The municipal entity must have "fail[ed] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face."

Thus, for example, if a city policymaker opts to provide no training whatsoever to police officers concerning the established and recurring constitutional duty not to use excessive deadly force, a factfinder may reasonably infer that the city acted with the requisite deliberate indifference. The [United States] Supreme Court explained as much in *Canton*, by way of hypothetical:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious[ ]" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

"Under those circumstances there is an obvious need for some form of training." Otherwise, the Supreme Court has said, there would be "no way for novice officers to obtain the legal knowledge they require" to conform their behavior to their clear and recurring constitutional obligations.

*Littell*, 894 F.3d at 624-25 (citations omitted).

And, at this stage,

to plead *Monell* liability under the single-incident exception where deliberate indifference is based on a general failure to provide adequate training, a plaintiff must allege factual content showing (or from which it may be inferred) that the training provided by the municipality was so inadequate that it should have predicted that those deficiencies would have caused the specific harm alleged, not that more or different training would have prevented it.

*Hutcheson v. Dall. Cnty., Tex.*, No. 3:17-cv-2021-BN, 2020 WL 1692950, at *6 (N.D. Tex. Apr. 7, 2020); *see, e.g., Littell*, 894 F.3d at 625 ("[T]he alleged facts, taken together and assumed to be true, permit the reasonable inference – i.e., the claim has

facial plausibility – that the risk of public officials' conducting unconstitutional searches was or should have been a 'highly predictable consequence' of the school district's decision to provide its staff no training regarding the Constitution's constraints on searches. Indeed, Plaintiffs' allegations mirror *Canton*'s hypothetical in all material respects.").

Henriquez's allegations fail to meet the factual plausibility standard for this requirement. That is, while she concludes that Johnson's training as to the use of force was poor, inadequate, or inappropriate, *see, e.g.*, Dkt. No. 47, ¶¶ 56-58, 60, 61, 65, 68, Henriquez does not allege that Johnson was not trained <u>at all</u> as to the use of force.

So, "[a]t most, [her] factual allegations raise an inference that, had the [City] provided more adequate training," "or had the [City] more competently administered its training program, the harm could have been prevented." *Hutcheson*, 2020 WL 1692950, at *8. "But … such allegations do not reflect that the [City] consciously chose to not train its officers – 'not even at all' – as to the use of deadly force." *Id.* (quoting *Jason v. Tanner*, 938 F.3d 191, 199 (5th Cir. 2019) ("We found that the facts [in *Littell*] 'mirror[ed] *Canton*'s hypothetical in all material respects.' But here, there was training. There was also a monitoring system in place. Again, it just failed to prevent the attack. Put differently: square peg, round hole. *Littell* was about a supervisor who didn't train his subordinates; not even at all. Had he adequately trained them, they would've known not to strip search young girls." (footnote omitted)).

For these reasons, the claims against the City should be dismissed with

prejudice. And, insofar as Henriquez seeks leave to replead *Monell* liability through a second amended complaint, *see* Dkt. No. 56 at 20-21, the undersigned cannot recommend granting such leave for the above-provided reasons and based on the parties' briefing.

But the time to file objections to these findings, conclusions, and recommendation allows Henriquez an opportunity to explain how she would cure the deficiencies identified above and therefore show the Court that it should not dismiss the claims against the City with prejudice but that it should instead grant her leave to amend these claims yet again. *See Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1209 (5th Cir. 2021) (per curiam) ("A court should freely give leave to amend when justice so requires, FED. R. CIV. P. 15(a)(2), but a movant must give the court at least some notice of what his or her amendments would be and how those amendments would cure the initial complaint's defects. *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590 (5th Cir. 2016). If the plaintiff does not provide a copy of the amended complaint nor explain how the defects could be cured, a district court may deny leave. *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002) (affirming denial of leave to amend where plaintiffs 'failed to amend their complaint as a matter of right, failed to furnish the district court with a proposed amended complaint, and failed to alert both the court and the defendants to the substance of their proposed amendment').").

## II. The Court should grant Johnson summary judgment on qualified immunity and dismiss the federal claims against him with prejudice.

### A. Evidence and Objections

As discussed at length below, Henriquez must rebut Johnson's good-faith assertion of qualified immunity at this stage by "point[ing] to summary judgment evidence '(1) that [Johnson] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (cleaned up). To support her version of the disputed facts, Henriquez submits an appendix that consists of Johnson's verified responses to the qualified immunity discovery authorized by the Court, *see* Dkt. No. 63 at 3-7, and excerpts of testimony from Johnson's state criminal trial – including his own testimony – each with a court reporter's certificate, *see id.* at 8-373.

But Johnson objects that this submission fails "to comply with the intent or spirit of our jurisprudence applicable to summary judgment proceedings," for example, insofar as the Court is not obligated to sift through this record unguided by Henriquez. Dkt. No. 64, ¶ 2. More importantly, he objects to the admissibility of the trial transcripts. *See, e.g., id.*, ¶ 1 ("These documents are hearsay to this Defendant, lack proper authentication, and are therefore inadmissible herein.").

So, as a threshold matter, the Court must consider Johnson's objections to the evidence submitted by Henriquez.

First, in her opposition to summary judgment, Henriquez points to specific excerpts from this trial testimony. *See* Dkt. No. 62 at 13-14, 18-19, 21-22. So, contrary to Johnson's objection, the Court is not "inundate[d with] voluminous documents in

an attempt to 'find a fact issue in there somewhere.'" Dkt. No. 64, ¶ 2 (footnote omitted). *Cf. Reyes v. Weslaco Indep. Sch. Dist.*, Civ. No. M-06-372, 2008 WL 11452112, at \*5 (S.D. Tex. Dec. 11, 2008) ("[T]he Court need not consider, but is not precluded from considering, evidence submitted but not referenced by Plaintiff in his response. In large part, the Court will rely on the portions of the deposition transcripts referenced by the parties in deciding Defendants' summary judgment motion.").

Still, Federal Rule of Civil Procedure 56 requires that factual assertions be "support[ed]" by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1); *see also* FED. R. CIV. P. 56(e).

And "[i]t is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment," *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n.12 (5th Cir. 1993) (collecting cases), as "[s]uch testimony is admissible on the same basis as affidavit testimony – thus, admissibility turns on the nature of the underlying testimony," *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 899 F. Supp. 974, 985 (E.D.N.Y. 1994); *see* FED. R. CIV. P. 56(c)(4); *Perry v. State of Ind.*, 16 F.3d 1225 (table), 1994 WL 59285, at \*5 (7th Cir. Jan. 19, 1994) (per curiam) ("A certified transcript of sworn testimony is considered an affidavit of the witnesses and may be submitted in support of a motion for summary judgment <u>so long as it meets the requirements of [Rule 56]</u>." (emphasis

added; citing *Advance Financial Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 27 (1st Cir. 1984); *Stevens v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161-62 (7th Cir. 1963); citation omitted)).[4]

So, regardless the evidence offered to support the factual allegations of the nonmovant, those assertions "must be supported by admissible evidence to defeat a motion for summary judgment," as "'[m]aterial that is inadmissible'" does "'not establish a genuine issue of material fact if offered at trial.'" *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 835 (S.D. Tex. 2013) (citing *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 192 (5th Cir. 1990), then quoting *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991)); *see also Trepagnier v. Alimak Hek, Inc.*, 784 F. App'x 195, 199-200 (5th Cir. 2019) (per curiam); *Travland v. Ector Cnty., Tex.*, 39 F.3d 319 (table), 1994 WL 612342, at *5 (5th Cir. Oct. 20, 1994) (per curiam).

Specific to Johnson's hearsay objections, "transcripts are not 'hearsay' merely because they consist of statements made by a witness in a prior proceeding, any more than an affidavit or a deposition offered in support of a motion for summary judgment

---

[4] *See also Walker v. Geithner*, No. 4:08-cv-317-A, 2009 WL 5171748, at *1 n.1 (N.D. Tex. Dec. 29, 2009) ("Many of the facts are developed from testimony given under oath in plaintiff's administrative hearings. Sworn testimony taken in an administrative proceeding has been considered to be probative summary judgment evidence." (citations omitted)); *Wagoner v. City of Portland*, No. 3:14-cv-2063-AC, 2017 WL 2369399 (D. Or. May 31, 2017) ("The transcripts of Wagoner and Lamar's bench trials are properly authenticated by the court reporter, and thus appropriate to consider as evidence." (citing current FED. R. CIV. P. 80; *Orr v. Bank of Am.*, 285 F.3d 764, 777 (9th Cir. 2002) (applying that rule to trial transcripts from state court))).

is inherently hearsay." *Tremont v. Halliburton Energy Servs., Inc.*, 696 F. Supp. 2d 741, 764 n.22 (S.D. Tex. 2010) (quoting *Ricupero v. Wuliger, Fadel & Beyer*, No. 1:91CV0589, 1994 WL 483871, at *4 (N.D. Ohio Aug. 26, 1994)). But,

> as with other forms of sworn testimony, a transcript of trial testimony is admissible evidence on a summary judgment motion only if it can be presented at trial in an admissible form – for example, the declarant may be available to testify at trial, or the testimony may meet some exception to the general prohibition on hearsay testimony.

*Burch v. Blockbuster, Inc.*, CV-03-BE-2990-E, 2005 WL 8158056, at *1 (N.D. Ala. July 15, 2005) (citations omitted); *see also Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) ("Neither the district court nor this court may properly consider hearsay evidence in affidavits and depositions…. [But w]e may properly consider the affidavits and depositions insofar as they are not based on hearsay or other information excludable from evidence at trial." (citations omitted)); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004) (observing that testimony from another case "was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay and was neither reaffirmed in an affidavit by [the witness] stating, for example, that he would give the same testimony at a trial of [the plaintiff's] claims, nor supported by any showing that that prior testimony would be admissible under Fed. R. Evid. 804(b)(1) if offered by [the plaintiff] at trial" (cited in *Tremont*, 696 F. Supp. 2d at 764 n.22)).

Taking first Johnson's prior testimony, authenticated by the court reporter, this evidence "is not hearsay because it constitutes an admission by a party opponent." *Davis v. Rockwall Cnty., Tex.*, No. 3:08-cv-1773-F, 2010 WL 11561759, at *1 n.2 (N.D. Tex. Dec. 16, 2010) ("Defendants have objected to Davis's use of the

Deputies' prior testimony on the grounds of hearsay, irrelevance, and prejudice to the Defendants. The prior testimony is not hearsay because it constitutes an admission by a party opponent." (citing FED. R. EVID. 801(d)(2)(A))); *see also Dressler v. Rice*, No. 1:15cv606, 2017 WL 3033877, at *3 (S.D. Ohio July 18, 2017) ("Plaintiff is the proponent of Officer Zucker's prior trial testimony. Because his statements are being offered by Plaintiff against Officer Zucker – an opposing party – his statements are not hearsay. FED. R. EVID. 801(d)(2)(A). Thus, to the extent Plaintiff relies on Officer Zucker's prior trial testimony, it is admissible."). *Cf. Sutton v. Duguid*, No. 05-CV-1215 (JFB)(JMA), 2007 WL 1456222, at *10 (E.D.N.Y. May 16, 2007) (relying on civil defendant's criminal trial testimony as the plaintiff's best version of the facts supported by proper summary judgment evidence to establish a constitutional violation).

And Johnson provides no credible objection to the Court's consideration of his sworn responses to interrogatories propounded in this litigation.

But Henriquez has not shown how the remaining excerpts of testimony from the criminal trial, by witnesses who are not parties here, are admissible and thus competent summary judgment evidence. *See Burch*, 2005 WL 8158056, at *2 ("Blockbuster has made no attempt to show that any of the witnesses, none of whom are parties, will be available at trial, or that the testimony will otherwise be reducible to admissible form at trial. Therefore, the court will not consider the transcripts of the trial testimony in ruling on the motion for summary judgment."); *Hunter v. Twn. of Shelburne*, No. 5:10-CV-206, 2012 WL 4320673, at *2 n.1 (D. Vt. Sept. 19, 2012)

("It is unclear whether the testimony given at Mr. Hunter's criminal trial is admissible, as it may constitute hearsay, *see* FED. R. EVID. 801, and the court lacks sufficient information to determine whether an exception applies that would render it admissible. *See* FED. R. EVID. 804(b)(1).").

The Court should therefore sustain in part and overrule in part Johnson's evidentiary objections and proceed to the qualified immunity inquiry relying just on the evidence provided by Henriquez that she has shown is admissible – Johnson's own testimony from his criminal trial and Johnson's sworn discovery responses made in this litigation.

### B.    Legal Standards

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law,'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned up; quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

"But government officials performing discretionary duties" can respond to such a claim by asserting qualified immunity. *Id.* at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

If they do, a court must consider each official's actions separately, *see Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007), on an expedited basis, *see Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (per curiam) ("Because qualified immunity is an *immunity from suit*, not merely a defense to liability, 'it is effectively lost if a case is erroneously permitted to go to trial.' It is for this reason that a denial of qualified immunity is immediately appealable and that a defendant's entitlement

to qualified immunity should be determined at the earliest possible stage of the litigation. This scheme prevents a defendant entitled to immunity from being compelled to bear the costs of discovery and other pre-trial burdens." (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); citations omitted)).[5]

> [T]he doctrine of qualified immunity attempts to balance two competing societal interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), then *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Phrased differently, this immunity "attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

The doctrine therefore "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per

---

[5] *See also Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) ("[B]ecause qualified immunity is 'not simply immunity from monetary liability' but also 'immunity from having to stand trial,' there is an interest in qualified immunity entering a lawsuit 'at the earliest possible stage of litigation.'" (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018) (quoting, in turn, *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989)))).

curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); internal quotation marks omitted); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015).

"'Accordingly, "qualified immunity represents the norm," and courts should deny a defendant immunity only in rare circumstances.'" *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting, in turn, *Harlow*, 457 U.S. at 807)); *but see, e.g., Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020) (calling for reconsideration of the doctrine); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of cert.) (calling on his colleagues to, "in an appropriate case" "reconsider either our one-size-fits-all test or the judicial doctrine of qualified immunity more generally").

The "qualified-immunity inquiry is two-pronged." *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)).

- Do "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right"? *Id.* at 190-91 (citing *Garcia*, 957 F.3d at 600)

- Was "the right at issue [] 'clearly established' at the time of the alleged misconduct"? *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (cleaned up; quoting *Pearson*, 555 U.S. at 232).

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The reasonableness of the official's conduct and the degree to which

the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34; *cf. Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("Fair notice requires clearly established law. That is, the law must 'clearly prohibit the officer's conduct in the particular circumstances before him' so 'every reasonable official' knows not to engage in that conduct." (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018); citing *al-Kidd*, 563 U.S. at 742)).

Under this standard, "'[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did].'" *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021) (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019) (citing, in turn, *Wesby*, 138 S. Ct. at 590 ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know."))).

A court may "'analyze the prongs in either order or resolve the case on a single prong.'" *Cunningham*, 983 F.3d at 191 (quoting *Garcia*, 957 F.3d at 600). But addressing this affirmative defense on a motion for summary judgment is not exactly intuitive.

"A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right … whether or not qualified immunity is involved." *Joseph*, 981 F.3d at 329 (footnote omitted).

But, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'" *Id.* at 329-30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *accord Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) ("The defense of qualified immunity 'alters the usual summary judgment burden of proof.' Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." (citations omitted)). "In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 330 (citing *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016)).

Once shifted, "the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam) (citation omitted). And, "[t]o rebut [a public official's] qualified immunity defense, a plaintiff must point to summary judgment evidence '(1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Cloud*, 993 F.3d at 383.

As to the first prong of the qualified-immunity inquiry, to overcome a public official's motion for summary judgment on qualified immunity, the plaintiff "must show that there is a genuine dispute of material fact and that a jury could return a

verdict entitling the plaintiff to relief for a constitutional injury" – just as would be required "if the plaintiff did not face qualified immunity." *Joseph*, 981 F.3d at 330. That is, the plaintiff must defeat summary judgment by showing that "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," *Cunningham*, 983 F.3d at 190-91.

When considering this showing, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004). But the Court need not do so if the plaintiff's "version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Joseph*, 981 F.3d at 325 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007); citing *Orr*, 844 F.3d at 590).

When accepting the plaintiff's well-supported version of the disputed facts, the Court must "view the facts and draw reasonable inferences in the light most favorable to" the plaintiff. *Id.* (footnote omitted). And, particularly applicable in *pro se* cases, "verified complaint[s] and other verified pleadings serve as competent summary judgment evidence." *Falon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)); *see, e.g.*, *Mitchell v. Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam).

But "the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. So, "when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was 'clearly established' at the time of the alleged

violation." *Id.* at 329 (footnote omitted).

And "[t]he 'clearly established' prong is difficult to satisfy." *Cunningham*, 983 F.3d at 191; *see also Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) ("We are bound by the restrictive analysis of 'clearly established' set forth in numerous Supreme Court precedents.").

The plaintiff "must show that the law was 'sufficiently clear' at that time 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova*, 994 F.3d at 726 (quoting *Mullenix*, 577 U.S. at 11). And "[t]here are two ways to demonstrate clearly established law" and meet this additional burden to make this second showing. *Id.*

The first approach "requires the plaintiff to 'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances ... was held to have violated the [Constitution]," *Joseph*, 981 F.3d at at 330 (footnote omitted); *accord Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (A clearly established right must be supported by "'controlling authority – or a "robust consensus of [cases of] persuasive authority" – that defines the contours of the right in question with a high degree of particularity.'" (quoting *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011))); *see also Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly

established." (footnote omitted)).

"It is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.'" *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (cleaned up; quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting, in turn, *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016))). Thus, the "clearly established law" "must be 'particularized' to the facts of the case." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up; quoting *White*, 137 S. Ct. at 552 (quoting, in turn, *al–Kidd*, 563 U.S. at 742)). And a clearly established right must be defined "'with specificity.'" *Cunningham*, 983 F.3d at 191 (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam)).

"This rule is a 'demanding standard.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 589). And "'[a]bstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case.'" *Nerio*, 974 F.3d at 575 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

"While there need not be 'a case directly on point,' the unlawfulness of the challenged conduct must be 'beyond debate.'" *Joseph*, 981 F.3d at 330 (footnotes omitted); *accord Tucker*, 998 F.3d at 173-74 ("For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *White*, 137 S. Ct. at 551 (internal quotation marks

omitted); citing *Mullenix*, 577 U.S. at 14)).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

"In other words, 'there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Cunningham*, 983 F.3d at 191 (quoting *Vincent*, 805 F.3d at 547).

Under the second approach to demonstrating clearly established law, a plaintiff asks the Court to look to "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590); *accord Batyukova*, 994 F.3d at 726; *Villareal v. City of Laredo, Tex.*, 17 F.4th 532, 539-40 (5th Cir. 2021).

"[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque*, 993 F.3d at 335 (cleaned up; quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). But "[t]he standard for obviousness is sky high." *Joseph*, 981 F.3d at 338. And "plaintiffs are only excused of

their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'" *Cope*, 3 F.4th at 206 (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (per curiam)); *see also Villareal*, 17 F.4th at 540 ("The point is this: The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts. An official who commits a patently 'obvious' violation of the Constitution is not entitled to qualified immunity." (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002))).

### C.    Analysis

"The Fourth Amendment creates a "right to be free from excessive force during a seizure.'" *Trammell*, 868 F.3d at 339-40 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); citation omitted). "To prevail on a Section 1983 excessive force claim, 'a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Shepherd v. City of Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) (quoting *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting, in turn, *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)); citing *Graham v. Connor*, 490 U.S. 386, 393-97 (1989)).

"[T]he touchstone" of this examination "is simply the reasonableness of the force employed." *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) (quoting *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022)). Accordingly, "[e]xcessive force claims are necessarily fact-intensive" – "whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Id.* (quoting *Deville*, 567 F.3d at 167 (quoting, in turn, *Graham*, 490 U.S. at 396)).

Specifically, a court should consider

> (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Trammell*, 868 F.3d at 340 (quoting *Graham*, 490 U.S. at 396); *see also Solis*, 31 F.4th at 983 ("Although not listed in the *Graham* factors, courts also consider the speed with which officers resort to force. This is because 'an officer must use force with measured and ascending actions that correspond to a suspect's escalating verbal and physical resistance.'" (citing *Trammell*, 868 F.3d at 342, then quoting *Joseph*, 981 F.3d at 332-33)).

"In this circuit 'the excessive force inquiry is confined to whether the officer was in danger at the moment of the threat that resulted in the officer's shooting. Therefore, any of the officers' actions leading up to the shooting are not relevant.'" *Shepherd*, 920 F.3d at 283 (quoting *Harris*, 745 F.3d at 772). And "[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Id.* (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)); *see also Reyes v. Bridgewater*, 362 F. App'x 403, 406 (5th Cir. 2010) ("Unlike some areas of constitutional law, the question of when deadly force is appropriate – and the concomitant conclusion that deadly force is or is not excessive is well-established.... [T]he focus of the inquiry is 'the act that led [the officer] to discharge his weapon.'" (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), then quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir.

2009))).

Under these standards, the admissible evidence before the Court does not support a constitutional violation, even if it could show, for the purpose of qualified immunity, that Johnson acted under color of state law. *See* Dkt. No. 63 at 5-6 (in which, in response to an interrogatory requesting whether he "used any verbal communication/commands at the scene directed" at J.C. or others, Johnson states "I thought I had said 'Police. Show me your hands.' Due to my police training and experience, making statements such as this is almost 'automatic' when deploying a weapon. However, I now believe I was mistaken since no other persons at the scene heard me say those words."); *Gomez v. Galman*, 18 F.4th 769, 775-76 (5th Cir. 2021) (per curiam); *id.* at 782 (Ho, J., concurring) ("[I]t is … the officers' conduct … that determines whether the defendants acted 'under color of [state law]' as required under 42 U.S.C. § 1983." (citing *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464-65 (5th Cir. 2010))).

As set out above, the only admissible evidence that Henriquez provides to support her version of the alleged constitutional violation are Johnson's criminal trial testimony and his sworn discovery responses in this matter. *See* Dkt. No. 63 at 8-73; *id.* at 3-7.

As reflected by this evidence, Johnson, an off-duty Farmers Branch patrol officer, who was the courtesy officer on duty at his apartment complex on March 13, 2016, observed through his apartment window a red two-door Challenger, a vehicle suspected of being associated with burglaries at the apartments. *See* Dkt. No. 63 at

17-18. He saw that the passenger in the Challenger (E.R.) was placing seats in the vehicle. *See id.* at 18-19. Believing that a robbery was in progress and intending to arrest the suspects, Johnson grabbed his gun and got into his own vehicle to pursue the Challenger. *See id.* at 19-20. During the pursuit, Johnson's vehicle and the Challenger wrecked, at which point Johnson quickly exited his vehicle and approached the Challenger, which had "windows [that] were dark, but you could still see" in. *Id.* at 20-21. He then onloaded his weapon 16 times, after observing J.C. "reach[] down, [he] took his hands off the steering wheel and reached down." *Id.* at 21. According to Johnson,

> I didn't want him to come back up and shoot at me through that window. That move he made was – I have been in situations like that before. And when he reached down, I wasn't going to die. I know people may say, he should have did this, should have did that, but when he made that movement.

*Id.*; *see also id.* at 4 (setting out a similar narrative as to what Johnson visually observed as to J.C.'s behavior – he "was observed to be still in the driver seat of the vehicle and suddenly remove his hands from the steering wheel and reach toward the area between the front seats – an area known to [Johnson] where weapons were often kept y criminal suspects." Johnson further "perceived that [J.C.] ignored loud and repeated orders to show his hands.").

This evidence reflects that, immediately before discharging his weapon, Johnson perceived a serious threat to his safety – that J.C. was reaching down for a weapon to use on Johnson.

Henriquez offers other testimony in response to summary judgment – to show that no weapon was found; that a police detective testified that the dark tint on the

Challenger prevented Johnson from seeing movement in the vehicle; that J.C.'s seatbelt prevented him from reaching down as Johnson testified; and that, according to E.R., J.C. did not, in fact, reach down. *See* Dkt. No. 62 at 18-19. But, as explained above, Henriquez has failed to carry her burden to show that this testimony is admissible such that the Court may now rely on it to deny qualified immunity.

And, even had admissible evidence established a Fourth Amendment violation, Henriquez has not carried her burden to show that the Fourth Amendment violation established by the admissible evidence "also constitute[s] a violation of clearly established law." *Joseph*, 981 F.3d at 330.

First, the record fails to show that this case presents "'extreme circumstances' where the constitutional violation is 'obvious.'" *Cope*, 3 F.4th at 206; *see, e.g.*, *Hope v. Pelzer*, 536 U.S. at 734-35, 739-41 (handcuffing a prisoner to a hitching post for seven hours in the sun with little water, while taunting him and refusing to allow him to use the restroom); *Taylor*, 141 S. Ct. at 53 (prison cells containing massive amounts of feces over a six-day period); *Villareal*, 17 F.4th at 541 ("It should be obvious to any reasonable police officer that locking up a journalist for asking a question violates the First Amendment."); *see also Joseph*, 981 F.3d at 337-38 (setting out other examples of extreme cases in which the Fifth Circuit found an obvious constitutional violation).

In the abstract, that statement may make little sense, considering that Johnson discharged 16 rounds and was subsequently convicted of murder and aggravated assault.

But "obvious" constitutional violations most often involve violations alleged (or

shown) to have occurred over longer periods of time, which may allow defendants ample time to reflect on their actions (and their egregiousness). Such violations less often occur – if at all – in excessive force cases turning on split-second decisions, which is why "specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 12); *see also Morrow*, 917 F.3d at 876 ("[O]vercoming qualified immunity is especially difficult in excessive-force cases. This 'is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.' … [E]xcessive-force claims often turn on 'split-second decisions' to use lethal force. That means the law must be *so* clearly established that – in the blink of an eye, in the middle of a high-speed chase – every reasonable officer would know it immediately." (citations omitted)).

So, because Henriquez has not carried the admittedly "sky high" burden to show that analogous case law is not necessary, *Joseph*, 981 F.3d at 338, she may only rebut qualified immunity's second prong by identifying a case or body of relevant case law in which a public official under circumstances like those here was found to have violated the Constitution. She has not. The cases Henriquez identifies, *see* Dkt. No. 62 at 19-22, even in the more specific context of force used against a fleeing felon, *see Mullenix*, 577 U.S. at 12, are not parallel to the facts supported by the admissible

evidence here.

And this failure to identify "[p]recedent involving similar facts," *Kisela*, 138 S. Ct. at 1153, is an independent basis that prevents Henriquez's rebutting Johnson's entitlement to qualified immunity.

But qualified immunity does not resolve Count V, alleged just against Johnson, for assault and battery under state law. *See Tamez v. City of San Marcos, Tex.*, 118 F.3d 1085, 1091 (5th Cir. 1997) ("The existence of qualified immunity is a question of federal law, and we consider it only insofar as it pertains to the federal Fourth Amendment claim for entry into the Tamez household. The official immunity issue is a matter of state law, which we consider separately.").

In his motion to dismiss, Johnson does argue that those claims "are barred by the election of remedies provision of Texas Civ. Prac. & Rem. Code Section 101.106(e)." Dkt. No. 48 at 2. But this issue has not been briefed, and the undersigned is not convinced that this provision applies here since the assault and battery claims are alleged only against Johnson, not a governmental unit.

The Texas Tort Claims Act "waives the state's immunity from suit in certain circumstances"; "covers all tort theories that may be alleged against a governmental entity whether or not it waives that immunity"; and provides that, "'[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.'" *Gil Ramirez Group L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 415 (5th Cir. 2015) (quoting Tex. Civ. Prac. & Rem. Code § 101.106(e); citation

omitted). So, "if a plaintiff brings virtually any state common law tort claim against both a governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." *Bustos*, 599 F.3d at 462-63 (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658 (Tex. 2008)).

Regardless, should the Court not grant Henriquez leave to file a second amended complaint, it should consider declining to exercise supplemental jurisdiction over the assault and battery claims against Johnson, which would then be the only claims remaining in this lawsuit. *See* 28 U.S.C. § 1367(c); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158-59 (5th Cir. 2011); *IntegraNet Physician Res., Inc. v. Texas Indep. Providers, L.L.C.*, 945 F.3d 232, 241-43 (5th Cir. 2019), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc).

## Recommendation

The Court should grant Defendant Ken Johnson's converted motion for summary judgment on qualified immunity [Dkt. No. 48], dismissing the federal claims against him with prejudice, and grant Defendant City of Farmers Branch, Texas's motion to dismiss the claims against it in the first amended complaint [Dkt. No. 52], dismissing the claims against it with prejudice unless, through her objections to these findings, conclusions, and recommendations, Plaintiff Ana Henriquez shows that she should be granted leave to allege a plausible claim of municipal liability through a second amended complaint.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 8, 2022

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE